This Opinion is a
Precedent of the TTAB

Mailed: September 29, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*KME Germany GmbH*
*v.*
*Zhejiang Hailiang Co., Ltd.*

————

Opposition No. 91267675

————

Courtney Jackson, Alec P. Harris, Donna F. Schmitt and Kristen H. Mowery
    of Armstrong Teasdale LLP, for KME Germany GmbH.

John Alumit of Alumit IP, for Zhejiang Hailiang Co., Ltd.

————

Before Kuhlke, Greenbaum and Larkin,
    Administrative Trademark Judges.

Opinion by Greenbaum, Administrative Trademark Judge:

This proceeding involves two companies who are competitors in the metal and

metal alloy business, and the sale of the brass division and portions of the tubes

manufacturing business of KME Germany GmbH ("Opposer") in 2019 to two wholly

owned subsidiaries of Zhejiang Hailiang Co., Ltd. ("Applicant") through a Share Asset

Purchase Agreement ("APA").[1]

---

[1] Per the APA, the parties to the sale were a predecessor of Opposer as "Seller," Hailiang
Germany GmbH and Hailiang Netherlands Holding B.V. as "Purchasers," and Opposer as
"Guarantor." 11 TTABVUE 16 (APA Definitions). As discussed more fully below, it is
undisputed that the Purchasers are wholly owned subsidiaries of Applicant, and that through

Applicant seeks registration on the Principal Register of the stylized mark HME,

displayed as **HME** , for

> Alloys of common metal; Branching pipes of metal; Brass, unwrought or semi-wrought; Cable junction sleeves of metal; Copper, unwrought or semi-wrought; Ducts of metal for ventilating and air-conditioning installations; Molybdenum bonded with other metals in the form of sheets, plates and foils for further manufacture; Poles of metal; Water-pipes of metal; Metal rods for brazing and welding, in International Class 6;
>
> Air-conditioning, air cooling and ventilation apparatus and instruments; Cooling installations for water; Industrial-water purifying apparatus; Ionization apparatus for the treatment of air; Pipes being parts of sanitary facilities; Regulating accessories for water supply, namely, metered valves; Air cooling apparatus, in International Class 11;
>
> Brackets, not of metal, for building; Building glass; Gutter pipes, not of metal; Plastic water conduits for roofs and balconies; Rigid pipes, not of metal; Rigid pipes, not of metal, for building; Water-pipes, not of metal; Building material, namely, plastic webbing material used to reinforce bituminous waterproofing sheets; Building materials, namely, fire and blast-resistant doors comprised primarily of reinforced cement and also including steel elements; Non-metal air conditioning ducts; Non-metallic drainage pipes; Non-metallic rigid pipes for construction purposes, in International Class 19.[2]

---

this purchase, Applicant effectively acquired Opposer's brass division and portions of its tube manufacturing business. In this decision, "Opposer" refers to Opposer and its predecessors, and "Applicant" refers to Applicant and its wholly owned subsidiaries and affiliates.

[2] Application Serial No. 88863480 was filed on April 8, 2020 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based upon Applicant's claim of first use anywhere and first use in commerce since at least as early as April 12, 2019 for each class of goods. The application includes the following description of the mark: "The mark consists of the stylized wording 'HME' with the 'H' formed partially by a square." Color is not claimed as a feature of the mark.

Opposer opposes registration of Applicant's mark on the grounds of false suggestion of a connection or affiliation with Opposer under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), and likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), based on:

> (1) prior common law rights in "various trademarks including the term KME together with other word and/or design elements" in association with "a wide variety of metal and metal alloy products and related services," Not. of Opp., 1 TTABVUE 6-7, ¶¶ 2-4;
>
> (2) registration of the mark KME (in typed format) for various metal goods and related services, including "semi-finished products of metal …; sheets, strips, profiled panels, rails all made of copper for use with windows, … wall claddings and roof coverings; tubes of metal for conducting gaseous, vaporous and or liquid media for use in air conditioning and refrigeration units" in International Class 6, and "[i]nstallation, maintenance, and repair of casting molds for the continuous casting of metals and metal alloys and equipment for industrial and commercial plants in the fields of energy recovery and power conducting," in International Class 37.[3] *Id*. at 7-8, ¶¶ 6-7; and
>
> (3) Opposer's application to register the mark KME and design, displayed as , for various goods and services in International Classes 6, 7, 9, 11, 17, 37, 40 and 42, including "pipes and tubes of metal" in Class 6, "air ventilating apparatus" in Class 11, and "constructing engineering services of sanitary and heating installations, roof coverings, façade claddings and roof drainage systems" in Class 42.[4] *Id*. at 8-9, ¶ 8.

---

[3] Reg. No. 2325245, which issued on March 7, 2000, and Reg. No. 2394599, which issued on October 17, 2000, respectively. Both registrations have been renewed. A typed mark is the legal equivalent of a standard character mark. *See* Trademark Rule 2.52(a), 37 C.F.R. § 2.52(a); *In re Viterra Inc*., 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012) ("until 2003, 'standard character' marks formerly were known as 'typed' marks.").

[4] Application Serial No. 79277605 was filed on July 12, 2019 under Section 66(a) of the Trademark Act, 15 U.S.C. § 1141f(a), seeking an extension of protection to the United States of International Reg. No. 1511843, issued on the same date, with a claimed priority date of April 9, 2019. Reg. No. 6926711 issued from this application on December 20, 2022.

In its Answer, Applicant admits the following allegations:

- Applicant acquired Opposer's brass division from Opposer, effective April 1, 2019. 4 TTABVUE 3, ¶ 11;

- Applicant did not use its mark before April 2019. *Id*. at 4, ¶16; and

- "Opposer is not connected or affiliated with Applicant's alleged mark of HME (and Design)." *Id*. at 5, ¶ 25.

Applicant denies the other salient allegations, and alleges no affirmative defenses.

The opposition is fully briefed.

We sustain the Section 2(d) claim, as explained below, and therefore need not reach the Section 2(a) claim. *CBC Mortg. Agency v. TMRR, LLC*, 2022 USPQ2d 748, at *29 n.22 (TTAB 2022).

As plaintiff in this proceeding, Opposer must prove its Section 2(d) claim by a preponderance of the evidence. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1848 (Fed. Cir. 2000). For purposes of our Section 2(d) analysis, we focus on Opposer's alleged prior common law rights in the KME mark for various metal goods, as Opposer did in its brief.

## I.  Record

The record consists of the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), Applicant's involved application file.

The record also includes the following submissions from Opposer and Applicant:

---

The mark is described as follows: "The mark consists of the stylized wording 'KME.' To the left of the wording is a stylized red ribbon. The color white represents background and is not claimed as a part of the trademark." The color red is claimed as a feature of the mark.

- Opposer's Notice of Reliance on Applicant's Responses to Opposer's Interrogatories and Requests for Admission.[5] 10 TTABVUE (confidential version located at 14 TTABVUE);

- Testimony Declaration of Ulrich Becker, former Managing Director at Opposer ("Becker Test. Decl."), with the APA attached as Exhibit 1. 11 TTABVUE (confidential version located at 15 TTABVUE);

- Testimony Declaration of Kerstin Rima, a paralegal for Opposer ("Rima Test. Decl."), with exhibits. 12-13 TTABVUE;

- Applicant's Notice of Reliance on Opposer's Responses to Applicant's Requests for Admission;[6] screenshots of Applicant's website; TESS database printouts of third-party registrations for ME and ME-inclusive marks; and screenshots of third-party websites displaying ME-inclusive marks. 16-17 TTABVUE;

- Testimony Affidavit of Yan Xueyan, Managing Director of HME Copper Germany GmbH,[7] and Assistant to General Manager of Applicant ("Xueyan Aff."), with exhibits. 18 TTABVUE; and

- Testimony Affidavit of Martin Gerlach, Sales Director of HME Copper Germany GmbH ("Gerlach Aff."). 19 TTABVUE.

## II.    Evidentiary Objections

Applicant lodged objections based on hearsay and relevance to portions of Ms. Rima's Testimony Declaration and associated exhibits. The evidence Applicant seeks

---

[5] Applicant's Responses to Opposer's Requests for Admission include admissions and denials. We consider only Applicant's admissions, as denials to requests for admission cannot be submitted under notice of reliance. *See* Trademark Rule 2.120(k)(3)(i), 37 C.F.R. § 2.210(k)(3)(i); *Life Zone Inc. v. Middleman Grp. Inc.*, 87 USPQ2d 1953, 1957 n.10 (TTAB 2008) (denials of requests for admission not admissible; the denial of a request for admission establishes neither the truth nor the falsity of the assertion, but rather leaves the matter for proof at trial).

[6] Opposer's Responses to Applicant's Requests for Admission include admissions and denials. As with Applicant's Responses to Opposer's Requests for Admission, we consider only Opposer's admissions. *See* Trademark Rule 2.120(k)(3)(i); *Life Zone*, 87 USPQ2d at 1957, n.10.

[7] HME Copper Germany GmbH is wholly owned by Applicant. Xueyan Aff., 18 TTABVUE 2 (preface).

to exclude pertains to (1) a November 27, 2020 decision of the European Union Intellectual Property Office ("EUIPO") in an opposition between Opposer and Applicant involving Opposer's KME mark and Applicant's stylized HME mark ("EUIPO Decision"), Rima Test. Decl., 12 TTABVUE 11-12, ¶¶ 58-66, and Exhibit 17, 12 TTABVUE 236-243, and (2) purported evidence of actual confusion in the nature of four emails between European companies and Opposer. Rima Test. Decl. 12 TTABVUE 25-30, ¶¶ 123-163, and Exhibits 59, 61-63, 13 TTABVUE 254-259, 263-300.

It is well established that the Board is not bound by the decisions of foreign tribunals. *In re Zuma Array Ltd.*, 2022 USPQ2d 736, at *4 n.9 (TTAB 2022) (citing *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1479 (TTAB 2017)). We see no reason to depart from the established practice in this case.[8] We therefore sustain the objection and do not further consider the EUIPO Decision and Ms. Rima's supporting testimony.

However, with respect to the four emails, Administrative Trademark Judges decide Board proceedings, and there are no lay jurors who might be easily misled, confused, or prejudiced by flawed evidence. *Cf. Harris v. Rivera*, 454 U.S. 339, 346 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions."). "Ultimately, the Board is capable of

---

[8] Opposer's argument that the EUIPO Decision is admissible under an exception per Article 6*bis* of the Paris Convention for Protection of Industrial Property because Applicant's mark is an imitation of Opposer's "well-known" KME mark assumes its own conclusion. Opp. Reply Br., 26 TTABVUE 7. We address below the similarity of the marks, as well as Opposer's claims that its KME mark is "well-known" and that Applicant willfully adopted a confusingly similar mark.

weighing the relevance and strength or weakness of the objected-to testimony and evidence in this case, including any inherent limitations, which precludes the need to strike the challenged testimony and evidence if the objection is well-taken." *Poly-America, L.P. v. Ill. Tool Works Inc.*, 124 USPQ2d 1508, 1510 (TTAB 2017).

As will become apparent in our discussion below, the emails are not outcome determinative. Accordingly, we see no compelling reason to discuss any of the objections specifically. Suffice it to say, we have considered all of the testimony and exhibits concerning the emails submitted by Opposer. In doing so, we have kept in mind Applicant's various objections, and we have accorded to the subject emails whatever probative value they merit. *See Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017).

III.    The Parties and the Share Asset Purchase Agreement (APA)

Opposer is one of the largest manufacturers of copper and copper alloy products in the world. Rima Test. Decl., 12 TTABVUE 2, ¶ 6, 12 TTABVUE 19, ¶ 104; Becker Test. Decl., 11 TTABVUE 3, ¶ 6. Opposer sells a wide variety of copper products, copper alloy products and other related metal products, and provides maintenance, repair and other services related to metal goods. Rima Test. Decl., 12 TTABVUE 3, ¶ 7; Becker Test. Decl., 11 TTABVUE 3, ¶ 9. Opposer has been involved in the metals industry for more than 100 years. Rima Test. Decl., 12 TTABVUE 3-4, ¶¶ 9-22 (detailing Opposer's corporate history and name changes). Opposer has used the KME mark on its goods and services in the United States for the last 25 years. *Id*. at 20, ¶¶ 107.

Before April 2019, Opposer also manufactured and sold a wide variety of brass products through its brass division, which operated through several wholly owned subsidiaries, including ones in Germany, Italy and France. Becker Test. Decl., 11 TTABVUE 3, ¶¶ 10-11. Opposer sold its brass division, and its tube manufacturing business in Germany and Spain (but not in Italy and France), to two wholly owned subsidiaries of Applicant through the APA, which was effective April 1, 2019. Rima Test. Decl., 12 TTABVUE 4, ¶ 18; Becker Test. Decl., 11 TTABVUE 4, ¶¶ 16-21. As a result of this sale, Applicant effectively acquired the assets of Opposer's brass division and tubes manufacturing business in various countries, but Opposer retained its other businesses. Rima Test. Decl., 12 TTABVUE 4, ¶¶ 18-19; Becker Test. Decl., 11 TTABVUE 4, ¶¶ 19, 21. Although Opposer does not now manufacture or sell most of the brass and tube products that it once did, Opposer still manufactures and sells flat brass and tubes through its sister companies in Italy and France, and similar products made of copper and other non-brass materials. Rima Test. Decl., 12 TTABVUE 4, ¶ 19; Becker Test. Decl., 11 TTABVUE 4-5, ¶ 22.

Applicant is a leader in the global copper tube and rod processing industry, with production plants for copper alloy rods and copper tubes in Germany, Italy, France and Spain. Gerlach Aff., 19 TTABVUE 2, ¶ 3. Since 1989, Applicant has manufactured and sold high-quality copper and copper alloy products that are widely used in industries such as air conditioning and refrigeration, water desalination, nuclear and thermal power, and electrical. *Id.* at 2, ¶¶ 1, 4.

In the APA, Opposer and Applicant agreed that Opposer would "maintain sole rights in the designation 'KME' for use as a trademark," APA § 19.5, and that after closing, Applicant would "eliminate references to 'KME'," APA § 19.5.1, and "cease making use of the trade names and product or service marks of [Opposer] or confusingly similar designations or trademarks." APA § 19.5.2. Becker Test. Decl., 11 TTABVUE 76.

Through the APA, Applicant acquired a complete business line from Opposer, including customer contracts, such as "customer contracts for purchase of tubes goods." Becker Test. Decl., 11 TTABVUE 5, ¶¶ 23 (referencing APA § 12.6), 26. Applicant now manufactures, advertises and sells, in association with the subject stylized HME mark, goods that Opposer previously sold, to customers who previously were Opposer's customers in the United. States. *Id*. at 5, ¶¶ 27-28. Such goods include the "brass, unwrought or semi-wrought" identified in Applicant's application. *Id*. at ¶ 27.

IV.    Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action, formerly referred to as "standing" by the Federal Circuit and the Board, must be established by the plaintiff in every inter partes case. *See Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *7 (Fed. Cir. 2020); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26, 109 USPQ2d 2061, 2067 n.4 (2014)); *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d

1058, 1062 (Fed. Cir. 2014). "To establish entitlement to a statutory cause of action, a plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) a reasonable belief in damage proximately caused by registration of the mark." *Corcamore*, 2020 USPQ2d 11277, at *4-6.

Ms. Rima testified that the parties are direct competitors in the metal industry: "Since [Opposer's] sale of its brass business to [Applicant] in 2019, I have observed that [Applicant] sells a variety of metal goods under the mark HME. These goods compete with [Opposer's] goods in the metal industry." Rima Test. Decl., 12 TTABVUE 21, ¶ 111. As a direct competitor of Applicant, Opposer, who asserts a Section 2(d) claim that is not entirely without merit, has an interest in opposing Applicant's application. *See, e.g., Empresa Cubana*, 111 USPQ2d at 1062 (Cuban cigar manufacturer had standing to seek cancellation of competitor's trademark registrations); *Books on Tape, Inc. v. Booktape Corp.*, 836 F.2d 519, 5 USPQ2d 1301, 1302 (Fed. Cir. 1987) (competitor "clearly has an interest in the outcome beyond that of the public in general" in seeking cancellation); *Double Coin Holdings Ltd. v. Tru Dev.*, 2019 USPQ2d 377409, at *4 (TTAB 2019) (entitlement to bring and maintain likelihood of confusion claim established, in part, by testimony with exhibits of earlier use of confusingly similar mark). Opposer's interest is squarely within the zone of interests protected by the statute, and it holds a reasonable belief that damage is proximately caused by the registration of Applicant's mark. Opposer has established its entitlement to a statutory cause of action under the Trademark Act, 15 U.S.C.

§ 1051, *et seq*. Moreover, Applicant, in its brief, does not dispute Opposer's statutory entitlement.

## V. Priority

Through the uncontroverted testimony of Ms. Rima, Opposer has proved its priority based on common-law use of the KME mark "in conjunction with the sale of its goods and services in the United States since at least as early as 1996." Rima Test. Decl., 12 TTABVUE 19, ¶ 99. Opposer uses the KME mark in association with various copper and copper alloy products (e.g., rolled copper, copper tubes, copper wire, copper used for architecture, roofing, and metal and casting), and maintenance and repair of these products. *Id.* at 3, ¶ 7. Mr. Becker corroborates this testimony. Becker Test. Decl., 11 TTABVUE 3, ¶ 9. Opposer also uses the KME mark in association with "water-pipes of metal" and "pipes being parts of sanitary facilities." Rima Test. Decl., 12 TTABVUE 22, ¶ 113. Oral testimony, if sufficiently probative, normally is sufficient to establish priority of use, *Powermatics, Inc. v. Glob. Roofing Prods. Co.*, 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965), and the testimony of a single witness may be adequate to establish priority. *See Exec. Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175, 1184 (TTAB 2017). Moreover, Applicant, in its brief, does not dispute Opposer's priority.

## VI. Likelihood of Confusion

Section 2(d) of the Trademark Act prohibits registration of a mark that so resembles a registered mark, or a mark previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the

goods or services of the applicant, to cause confusion or mistake, or to deceive. 15 U.S.C. § 1052(d). The determination under Section 2(d) involves an analysis of all of the probative evidence of record bearing on a likelihood of confusion. *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (setting forth factors to be considered, hereinafter referred to as "*DuPont* factors"); *see also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). We must consider each *DuPont* factor for which there is evidence and argument. *See In re Guild Mortg. Co.,* 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019).

Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *See In re Charger Ventures LLC*, 64 F.4th 1375, 2023 USPQ2d 451, at *4 (Fed. Cir. 2023) ("In any given case, different *DuPont* factors may play a dominant role and some factors may not relevant to the analysis."). "Not all *DuPont* factors are relevant in each case, and the weight afforded to each factor depends on the circumstances. Any single factor may control a particular case." *Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994, 2020 USPQ2d 10341, at *3 (Fed. Cir. 2020) (citing *In re Dixie Rests.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533 (Fed. Cir. 1997)).

"Each case must be decided on its own facts and the differences are often subtle ones." *Indus. Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 177 USPQ 386, 387 (CCPA 1973). However, in any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192

USPQ 24 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). These factors and others for which there is argument and evidence are discussed and weighed below.

A.    Similarity or Dissimilarity of the Goods and Services, and Channels of Trade

Under these *DuPont* factors, we base our evaluation on the goods as they are identified in Applicant's application and any goods or services for which Opposer has established prior common law rights through use of its KME mark in the United States. *See Stone Lion Cap. Partners, LP v. Lion Cap. LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014); *Octocom Sys. Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). Opposer may establish likelihood of confusion as to an entire class of identified goods in Applicant's application by showing the relatedness of its own goods or services to any item within that class. *Bertini v. Apple Inc.*, 63 F.4th 1373, 2023 USPQ2d 407, at *4 (Fed. Cir. 2023) (citing *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981)). In addition, the parties' goods and services need not be identical to support a finding of likelihood of confusion. *See On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000) (the goods and services need not be identical or even competitive to find a likelihood of confusion). Rather, "likelihood of confusion can be found 'if the respective products [or services] are related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they

emanate from the same source." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)).

Applicant presented no argument in its brief about the similarity of the goods/services and the channels of trade or classes of consumers. And as demonstrated below, the record amply supports Applicant's apparent concessions of similarity as to these *DuPont* factors.

Ms. Rima testified that the metal goods identified in Applicant's application "compete with [Opposer's] goods in the metal industry." Rima Test. Decl., 12 TTABVUE 21, ¶ 111. According to Ms. Rima, Opposer consistently uses its KME mark in the United States in the advertising and sale of many of the goods identified in the application, including, for example, "Copper, unwrought or semi-wrought; Water-pipes of metal; Pipes being parts of sanitary facilities." *Id.* at 22, ¶ 113. Both parties also sell copper tube products, metal rods and bars, and metal wire under their respective marks in the United States. *Id.* at 23-25, ¶¶ 115-22. And Ms. Rima points to the copper tubes as an example of identical products with identical customers, namely, manufacturers in the refrigeration and air conditioning industries. *Id.* at 23-25, ¶¶ 117-22 (referencing Exhibits 49-58, 13 TTABVUE 154-253).

She further testified that all of the other goods identified in Applicant's application that Opposer does not sell "are highly related to goods or services that [Opposer] does sell, and sells in conjunction with the KME mark. These goods are

sold to the same buyers, have the same customer uses, and are all widely used in the commercial industries." *Id*. at 22-23, ¶ 114. Ms. Rima identified Radio Frequency Systems and Myat Inc. as examples of the parties' identical customers in the United States. *Id*. She also testified that Opposer provides maintenance and repair services related to metal goods. *Id*. at 3, ¶ 7.

The record amply supports a finding that the Class 6 goods identified in the application includes goods that are identical and otherwise closely related to the metal goods and associated maintenance and repair services for which Opposer has established prior use of its KME mark. The record also supports a finding that the Class 11 "pipes being parts being parts of sanitary facilities" identified in the application are identical to the "pipes being parts of sanitary facilities" for which Opposer has established prior use of its KME mark. We further find the Class 19 "water-pipes, not of metal" identified in the application inherently related to the "water-pipes of metal" for which Opposer has established prior use of its KME mark because they are alternative products that serve the same purpose, i.e., supplying water.

The application includes no restrictions as to the channels of trade or classes of purchasers. We therefore must presume that the identified goods move in all normal and usual channels of trade and methods of distribution for those goods, and that they are available for purchase by all the usual purchasers. *Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 56 USPQ2d 1351, 1357 (Fed. Cir. 2000) ("When the registration does not contain limitations describing a particular channel of trade

or class of customer, the goods or services are assumed to travel in all normal channels of trade."); *Squirtco v. Tomy Corp.*, 697 F.2d 1038, 216 USPQ 937, 940 (Fed. Cir. 1983). No such presumptions attach to Opposer's common law rights in the KME mark for the goods and services for which Opposer has established prior use. *Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1345 (TTAB 2017). Opposer's channels of trade for such goods and services are limited to its common law uses. *Hard Rock Café Int'l (USA) Inc. v. Elsea*, 56 USPQ2d 1504, 1512 (TTAB 2000).

The testimony of Mr. Becker and Ms. Rima demonstrate that all of the goods identified in the application move in highly similar, and sometimes identical, channels of trade, and are sold to at least some of the same customers, as the metal goods and maintenance and repair services for which Opposer has established prior use of the KME mark. In fact, Mr. Becker testified that Applicant now sells goods that Opposer previously sold, to Opposer's former customers in the United States. Becker Test. Decl., 11 TTABVUE 5-6, ¶¶ 26-28. The overlapping channels of trade include online marketing materials hosted on the parties' websites, brochures, including some posted on their websites, and trade shows. Rima Test. Decl., 12 TTABVUE 23-25, ¶¶ 115-22 (referencing Exhibits 49-58, 13 TTABVUE 154-253); Becker Test. Decl., 11 TTABVUE 6, ¶¶ 29-30. The goods also are sold through receipt of purchase orders and discussions with sales representatives. Becker Test. Decl., 11 TTABVUE 6, ¶ 31.

The second and third *DuPont* factors thus strongly favor a finding of a likelihood of confusion.

B. Conditions Under Which and Buyers to Whom Sales are Made

Next, we consider the conditions under which the goods and services are likely to be purchased, e.g., whether on impulse or after careful consideration, as well as the degree, if any, of sophistication of the consumers. "Purchaser sophistication may tend to minimize likelihood of confusion. Conversely, impulse purchasers of inexpensive items may tend to have the opposite effect." *Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1695 (Fed. Cir. 2005).

Opposer acknowledges that the relevant consumers "are relatively sophisticated, because their goods are generally suited for commercial use." 22 TTABVUE 26. However, Mr. Becker testified that suppliers in the metal industry, such as Opposer, "often undergo name changes, mergers, spinoffs, and other changes to their legal form. Indeed, [Opposer] has itself done so in recent years. As a result, customers in this space often see their suppliers, such as [Opposer], undergo such changes without experiencing a change in goods and services." Becker Test. Decl., 11 TTABVUE 6, ¶ 33. Based on this testimony, and Ms. Rima's testimony about Opposer's long corporate history, Rima Test. Decl., 12 TTABVUE 3-4, ¶¶ 8-22, Opposer argues in its brief that "even sophisticated customers are likely to be confused as to the origin of the goods associated with the HME mark because of [Opposer's] history of changing its name, [Opposer's] prior ownership of [Applicant's] brass division, and industry norms in this regard." 22 TTABVUE 27. Applicant counters that confusion is unlikely due to the nature of the goods, and because Applicant's and Opposer's websites do not

provide pricing details or allow for an online purchase, thus necessitating "further inquiry, at least as to application of the goods, their dimensions and pricing" before making a purchase. 25 TTABVUE 18.

While purchasers of Applicant's and Opposer's goods and services may be somewhat discriminating in their purchases, this record does not support a finding that the level of care exercised in such purchases is so significant that it would obviate likely confusion. Moreover, even where there may be some care taken in the purchasing process, consumers sophisticated or knowledgeable in a particular field are not necessarily immune to source confusion, especially in cases such as this one, involving identical and otherwise closely related goods and services, and marks that are similar (discussed below). *See Cunningham*, 55 USPQ2d at 1846 ("The alleged sophistication of golfers is outweighed by the Board's findings of strong similarity of marks and identity of goods, both of which we uphold.").

The fourth *DuPont* factor is neutral.

### C.  Similarity or Dissimilarity of the Marks

Next, we compare Opposer's mark KME, and Applicant's stylized mark HME, displayed as **HME** , "in their entireties as to appearance, sound, connotation and commercial impression."[9] *Palm Bay Imps.* 73 USPQ2d at 1691 (quoting *DuPont*, 177 USPQ at 567). "Similarity in any one of these elements may be sufficient to find

---

[9] In its brief, Applicant consistently refers to its mark as "HME," and to the first letter of the mark as an "H."

the marks confusingly similar." *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018), *aff'd mem.*, 777 Fed. Appx. 516 (Fed. Cir. 2019) (citing *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)); *accord Krim-Ko Corp. v Coca-Cola Bottling Co.*, 390 F.2d 728, 156 USPQ 523, 526 (CCPA 1968) ("It is sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion.").

"The proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Cai v. Diamond Hong, Inc.,* 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018). "Similarity is not a binary factor but is a matter of degree." *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014) (quotation omitted). We also bear in mind that because each class of goods identified in the application includes goods that are identical or closely related to the goods and services for which Opposer has established prior use of its KME mark, the degree of similarity necessary to find likelihood of confusion need not be as great as where there is a recognizable disparity between the goods. *Coach Servs.,* 101 USPQ2d at 1721 ("In this fact-specific inquiry, if the parties' goods are closely related, a lesser degree of similarity between the marks may be sufficient to give rise to a likelihood of confusion."); *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992) ("When marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines.").

When considered in their entireties, we find Opposer's KME mark and Applicant's  mark to be similar in appearance, sound, connotation and commercial impression. The marks share the same structure and are each three letters. Although the marks begin with different letters, K versus H, the last two letters, ME, are identical, so they sound somewhat similar. Moreover, the letters K and H are visually similar—both have an overall rectangular shape consisting only of straight lines, both have a vertical straight line on their left sides, and another line extending to the right from roughly the middle section of that vertical line.

The stylization in Applicant's mark is minimal and does not create a commercial impression separate from the letters themselves. *See, e.g., In re 1st USA Realty Prof'ls Inc.*, 84 USPQ2d 1581, 1584 (TTAB 2007) ("The registered mark is for the words FIRST USA in a slightly stylized typestyle. However, the stylization is so minimal that it does not make a real commercial impression."). In fact, the stylized letters in Applicant's mark add to the visual similarities with Opposer's mark, which appears in a similar "blocky" font as shown in the below examples of Opposer's uses in the United States on its website and in brochures, Rima Test. Decl., 12 TTABVUE 244-708 (Exhibits 18-19), and at trade shows. *Id.* at 13 TTABVUE 43-55 (Exhibits 23-28).



In addition, Applicant's mark is not limited to any particular color, so color cannot distinguish the marks.[10] *See Viterra*, 101 USPQ2d at 1910; *Citigroup v. Cap. City Bank Grp.*, 637 F.3d 1344, 98 USPQ2d 1253, 1259 (Fed. Cir. 2011).

There is no evidence that either three-letter combination has any meaning or significance in the context of the goods identified in the application and the goods and services for which Opposer has established prior use. Both marks are arbitrary for the goods and services, and to that extent, they are connotatively similar, particularly because they share the last two letters.

Ms. Rima testified that Opposer was previously known as KM Europa Metal Aktiengesellschaft, and that the predecessor to KM Europa Metal Aktiengesellschaft was created through the purchase by an Italian company of the German company KM Kabelmetal AG, Rima Test. Decl., 12 TTABVUE 3-4, ¶¶ 11-17, but her testimony does

---

[10] According to Mr. Xueyan, "[p]rior to the April 1, 2019 agreement, the color blue was a main color tone of [sic] [Applicant], and it is widely used in its trademarks and websites. The art deformation of the beginning letter H ( ) has been used in many products and trademarks of [Applicant], becoming a distinctive feature of the company and its products and services." Xueyan Aff., 18 TTABVUE 2, ¶ 2 (referencing Exhibit 2, 18 TTABVUE 26-36). The "beginning letter H" appears "in the color blue with the red dot." *Id*. at 2, ¶ 3 (referencing Exhibit 3, 18 TTABVUE 37-38). This testimony is not relevant because it pertains to different marks than Applicant's stylized HME mark. Moreover, as stated above, that mark does not include any color claim. *See* Trademark Rule 2.52(b)(1), 37 C.F.R. § 2.52(b)(1) ("If the mark includes color, the drawing must show the mark in color, and the applicant must name the color(s), describe where the color(s) appear on the mark, and submit a claim that the color(s) is a feature of the mark.").

not support a finding that KME has any meaning or significance in the context of the goods and services for which Opposer has established priority.

As for Applicant, Mr. Xueyan testified that "The letters 'M' and 'E' were intended to signify 'metals' and 'Europe,' respectively. Together, 'HME (stylized)' signifies 'Hailiang Metals Europe." Xueyan Aff., 11 TTABVUE 3, ¶ 8. Likewise, in response to Opposer's Interrogatory Nos. 6 and 7, Applicant states that "'HME' stands for 'HAILANG [sic] METAL EUROPE.'"[11] Opp. Not. of Rel., 10 TTABVUE 16-17. However, there is no evidence that Applicant promotes or consumers are aware of the corporate origins or the intended meanings of any of the letters (or the combination of the letters "ME") in Applicant's mark. To the extent the record shows any derivational meaning of the letters in the mark, the derivations of acronyms are of no particular significance absent evidence that consumers would make that connection. *See Aerojet-Gen'l Corp. v. Comput. Learning & Sys. Corp.*, 170 USPQ 358, 362 (TTAB 1971) (fact that acronyms are derived from different words unimportant because average purchasers probably unaware of derivation).

We must consider the marks "in light of the fallibility of human memory" rather than by comparing them side-by-side, *St. Helena Hosp.*, 113 USPQ2d at 1085 (quotation omitted), and many consumers "may have but dim recollections from having previously seen or heard one of the other of the involved marks." *Neutrogena*

---

[11] Interrogatory No. 6 asks Applicant to "Describe the actions You took to comply with Section 19.5 of the APA, including but not limited to all actions taken to ensure that You did not use any mark 'confusingly similar' to KME …." Interrogatory No. 7 asks Applicant to "Describe what actions You have taken, if any, to ensure that Your customers and the general public are not confused between the HME Mark and the mark 'KME' …."

*Corp. v. Bristol-Myers Co.*, 410 F.2d 1391, 161 USPQ 687, 688 (CCPA 1977). The recall of marks "among ordinary purchasers is often hazy and imperfect." *Edison Bros. Stores, Inc. v. Brutting E.B. Sport-Int'l GmbH*, 230 USPQ 530, 536 (TTAB 1986).

These principles apply with special force to arbitrary letter combinations, such as those at issue here, because it is inherently difficult for consumers to distinguish between marks involving similar letters. *Crystal Corp. v. Manhattan Chem. Mfg. Co.*, 75 F.2d 506, 25 USPQ 5, 6 (CCPA 1935) ("We think that it is well known that it is more difficult to remember a series of arbitrarily arranged letters than it is to remember figures, syllables, words, or phrases. The difficulty of remembering such lettered marks makes confusion between such marks, when similar, more likely."); *see also Weiss Assoc. Inc. v. HRL Assoc. Inc.*, 902 F.2d 1540, 14 USPQ2d 1840, 1841 (Fed. Cir. 1990) ("Because it is hard to distinguish between these letters, the mark TMM is confusing with TMS."); *Dere v. Inst. for Sci. Info., Inc.*, 420 F.2d 1068, 164 USPQ 347, 348 (CCPA 1970) ("it is more difficult to remember a series of arbitrarily arranged letters than it is to remember figures, syllables, or phrases," and "the difficulty of remembering such multiple-letter marks makes the likelihood of confusion between such marks, when similar, more probable."); *Edison Bros.*, 230 USPQ at 533 (EB and EBS for shoes are likely to cause confusion because "confusion is more likely between arbitrarily arranged letters than between other types of marks.").

We find it more likely than not that a consumer with a general rather than a specific impression or recollection of Opposer's mark KME who is exposed to

Applicant's mark HME, displayed as , or vice-versa, for in-part identical goods and otherwise closely related goods and services, will not recall or recognize that one of the marks starts with the letter "K" and the other starts with the letter "H." Rather, consumers will remember the overall commercial impressions of the marks, which we find similar, largely due to the structural and visual similarities between the marks, discussed above. Of particular note, both marks consist of three letters, the last two of which are identical, the design of the letter "H" in Applicant's mark resembles the letter "K" in Opposer's mark, and, as demonstrated above, Opposer's mark has been displayed in a font very similar to the font used by Applicant. Also as discussed above, the marks are somewhat similar in sound due to the shared last letters "ME," and they are equally arbitrary in the context of Applicant's goods and the goods and services for which Opposer has established priority. The structural, aural and connotative similarities contribute to the marks' overall similar commercial impressions.

There are some specific differences between the marks, but these differences are outweighed by the marks' overall similarities. Considering the marks as a whole, we find them similar. *See, e.g., Cities Serv. Oil Co. v. A.W. Chesterton Co.*, 127 USPQ 459, 460-61 (TTAB 1960) (finding "DCS" and "D-C" for industrial oils confusingly similar).

The first *DuPont* factor also weighs in favor of a finding of likelihood of confusion.

### D.    Strength of Opposer's Mark—Fifth and Sixth *DuPont* Factors

Next, we consider the strength or weakness of Opposer's KME mark under the fifth and sixth *DuPont* factors, as that may affect the scope of protection to which

Opposer's mark is entitled. *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015) ("The weaker an opposer's mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrower range of protection."). Opposer may expand the scope of protection afforded the pleaded mark by adducing evidence of "[t]he fame of the prior mark (sales, advertising, length of use)" under the fifth *DuPont* factor, while Applicant may contract that scope of protection by adducing evidence of "[t]he number and nature of similar marks in use on similar goods" under the sixth *DuPont* factor. *DuPont*, 177 USPQ at 567. *See, e.g., Monster Energy Co. v. Lo*, 2023 USPQ2d 87, at *19-20 (TTAB 2023).

In determining the strength of a mark, we consider both its inherent strength, based on the nature of the mark itself, and if there is probative evidence in the record, its commercial strength, based on marketplace recognition of the mark. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength … and its marketplace strength."); *Top Tobacco, L.P. v. N. Atl. Operating Co., Inc.*, 101 USPQ2d 1163, 1171-72 (TTAB 2011) (the strength of a mark is determined by assessing its inherent strength and its commercial strength); *Tea Bd. of India v. Republic of Tea Inc.*, 80 USPQ2d 1881, 1899 (TTAB 2006). And as just noted, evidence of third-party use and registration also may bear on the strength of a mark. *See Spireon, Inc. v. Flex Ltd.*, 71 F.4th 1355. 2023 USPQ2d 737, at *4 (Fed. Cir. 2023) (sixth *DuPont* factor "is a

measure of the extent to which other marks weaken the assessed mark") (citing *Palm Bay Imps.*, 73 USPQ2d at 1693).

### 1. Inherent/Conceptual Strength

Opposer's mark KME is inherently distinctive because, as discussed above, it is a three-letter combination with no recognized meaning or significance in connection with the goods and services for which Opposer has established prior use. As such, Opposer's mark is arbitrary, and therefore conceptually strong.

### 2. Commercial Strength

Commercial strength is the extent to which the relevant purchasing public recognizes a mark as indicating a single source. *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 22 USPQ2d 1733, 1734 (Fed. Cir. 2017) (per curiam). In the likelihood of confusion context, commercial strength is not an "all-or-nothing measure," but rather involves placing a mark on a "spectrum," which ranges from "very strong to very weak." *Id. (*quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059, 1061 (Fed. Cir. 2003)). The stronger the mark, the greater the scope of protection. *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992) ("[S]trong marks enjoy a wide latitude of legal protection.").

Opposer contends that the KME mark "warrants protection as a well-known mark" because Opposer "is an internationally acclaimed producer in its product market, and because it is known by its mark KME." 22 TTABVUE 28. We consider this argument and all supporting evidence in the context of consumers in the United States under the fifth *DuPont* factor. *Cf. Fiat Grp. Autos. S.p.A. v. ISM, Inc.*, 94

USPQ2d 1111, 1115 (TTAB 2010) ("nowhere in the Lanham Act itself is the 'well known mark' doctrine specified") (citations omitted).

In support, Ms. Rima testified that Opposer sells all of its goods and services worldwide in association with the KME mark. Rima Test. Decl., 12 TTABVUE 19, ¶ 101. Ms. Rima provided charts showing Opposer's total annual worldwide advertising and promotional expenditures for, and significant worldwide revenues derived from the sale of, Opposer's goods and services under the KME mark. *Id.* at 17, ¶ 95 (advertising and promotional expenditures 2017-2021), and at 19, ¶ 102 (revenues 2017-2020).[12] She also testified that Opposer has been involved in the metals industry for more than 100 years, and is recognized in the industry, in the United States, and worldwide as a leading manufacturer of copper and copper alloy products. *Id.* at 19-21, ¶¶ 104-110. In addition, Ms. Rima testified that Opposer has used the KME mark in the United States and worldwide for the last 25 years, *id.* at 20, ¶ 107, and several third-party publications (e.g., Reuters, American Metal Market, Business Wire and PR Newswire) refer to Opposer by its KME mark rather than by its full name. *Id.* at 20-21, ¶ 110 (referencing Exhibits 39-48, 13 TTABVUE 109-153.

"Commercial strength is a question of whether consumers in fact associate the … mark with a unique source, and can be shown by, for instance, exclusive use of a mark in the marketplace, advertising and marketing, and sales." *Spireon,* 2023 USPQ2d 737, at *4 (internal citation omitted). *See Bridgestone Ams. Tire Opers., LLC v. Fed.*

---

[12] The figures are confidential, so we refer to them only in general terms.

*Corp.*, 673 F.3d 1330, 102 USPQ2d 1061, 1064 (Fed. Cir. 2012) ("The prolonged exclusive use of these marks, the extensive promotion and marketing, the billions of dollars in sales, of tires bearing these marks, shows commercial strength."). It may also be measured indirectly by "other factors such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the [goods and services] identified by the mark []; and the general reputation of the [goods and services]." *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1056 (TTAB 2017); *see also Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305-06 (Fed. Cir. 2002). Raw numbers alone may be misleading, however. Thus, some context in which to place raw statistics may be necessary, for example, market share or sales or advertising figures for comparable types of goods and services. *Bose*, 63 USPQ2d at 1309.

There are deficiencies in Opposer's evidence that preclude us from finding KME commercially strong under the fifth *DuPont* factor for the goods and services for which Opposer has established prior use. For example, Opposer claims use of the mark in the United States for the last 25 years, but provided only worldwide advertising and revenue figures. On this record, we cannot tell how much, if any, of the advertising figures were directed to promotional efforts in the United States, or how much, if any, of the revenue was derived from sales of Opposer's goods and services in the United States. Nor did Opposer provide any contextual information such as Opposer's market share in the United States. *Cf. Bose*, 63 USPQ2d at 1309. Evidence of Opposer's use of the KME mark outside the United States is not evidence of the

commercial strength of the KME mark for the identified goods and services in the United States.[13] *See Hard Rock Café*, 48 USPQ2d at 1405 ("While the alleged fame of opposer's mark is a factor to consider in relation to opposer's claim of likelihood of confusion, only the fame of opposer's mark among consumers in the United States is of relevance to us. The renown of opposer's marks outside the United States or exposure of the foreign public to opposer's marks is irrelevant.").

Further, while Opposer made of record articles in various publications, including some in the metals industry, which have referred to Opposer by its KME mark, they have little, if any, probative value. Rima Test. Decl., 13 TTABVUE 109-53 (Exhibits 39-48). This is so for many reasons, including because most of the articles only mention KME in passing and in the context of reporting Opposer's business outside the United States, the extent of the articles' distribution and public availability within the United States is unknown, especially the several articles bearing non-U.S. datelines, and none of the articles comprise unsolicited media attention of Opposer's mark in association with its goods and services in the United States. *See, e.g., Made in Nature, LLC v. Pharmavite, LLC*, 2022 USPQ2d 557, at *32-33 (TTAB 2022) (discussing similar evidentiary insufficiencies). For example, the BusinessWire article, which bears a "Dublin" dateline, lists "KME" as one of the "Companies Mentioned," but says nothing further about "KME." Rima Test. Decl., 13 TTABVUE

---

[13] While it is possible that "in an unusual case, activity outside the United States related to a mark could potentially result in the mark becoming well-known within the United States, even without any form of activity in the United States," *Fiat*, 94 USPQ2d at 115, Opposer has not argued that this is such "an unusual case," and on this record, we do not find it so.

115-120 (Exhibit 41). Likewise, the PRNewswire article, which appears quite similar to the BusinessWire article, also bears a "Dublin" dateline, and lists "KME" as a "key player" in the "Competitive Landscape," but says nothing further about "KME." *Id.* at 121-127 (Exhibit 42). And a press release posted by LSMedia ("The Independent Liverpool Student Newspaper"), which appears to be marketing material for a market report study on the Shaped Copper Tube Market, lists "KME" among others as a "major player[]," but says nothing further about "KME." *Id.* at 139-45 (Exhibit 46). Newswire articles and other documents whose distribution is uncertain generally have limited probative value because we cannot judge the public's exposure to the use of the term KME in the newswire. *See In re Int'l Business Machines Corp.*, 81 USPQ2d 1677, 1683 n.10 (TTAB 2006) ("Newswire stories do not have the same probative value as stories appearing in newspapers and magazines.") (citing *In re Cell Therapeutics Inc.*, 67 USPQ2d 1795 (TTAB 2003)).

### 3. Evidence of Third-Party Use and Registration

There is no evidence of third-party use or registration of the three-letter combination KME (or KME-formative marks) for goods or services similar to those for which Opposer has established prior use of the KME mark.

However, Applicant contends that Opposer's KME mark is entitled to a limited scope of protection because the two-letter combination "ME" is "rather weak in the metals industry, and highly suggestive of 'metal.'" 25 TTABVUE 13. Applicant further contends that "when considering Applicant's and Opposer's metal goods, prospective consumers would only understand 'ME' to refer to the fact that the goods feature 'metal' as the evidence shows that many companies use the letters 'ME' to

refer to a 'metal' feature." *Id*. at 15. As support, Applicant points to four marks comprising the two-letter combination "ME" in stylized formats, and four marks comprising three or four-letter combinations ending with the letters "ME" (GME, DME, HME and ACME). *Id*. at 13-16.

"The existence of third-party registrations on similar goods can bear on a mark's conceptual strength." *Juice Generation*, 115 USPQ2d at 1675. "Specifically, third-party registrations containing an element that is common to both the opposer's and the applicant's marks can show that that element has 'a normally understood and well-recognized descriptive or suggestive meaning." *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015) (quoting *Juice Generation,* 115 USPQ2d at 1675). If the evidence establishes that the consuming public is exposed to third-party uses of similar marks for similar goods or services, it "is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." *Palm Bay Imps.*, 73 USPQ2d at 1693. "In addition, evidence of third-party use of similar marks on similar goods 'can show that customers have been educated to distinguish between different marks on the basis of minute distinctions." *Jack Wolfskin*, 116 USPQ2d at 1136 (quoting *Juice Generation*, 115 USPQ2d at 1674). "Extensive evidence of third-party use and registrations is 'powerful on its face,' even where the specific extent and impact of the usage has not been established." *Id*. at 1135-36 (quoting *Juice Generation,* 115 USPQ2d at 1674).

The following chart summarizes the stylized "ME" marks:

| Mark & Reg. No. | Owner | Relevant Goods (Registered) | Relevant Goods (Unregistered) |
|---|---|---|---|
| ME (stylized) (Reg. No. 6178136)[14] *Id*. at 26-27. | Madison Electric Products | tubes, pipe fittings, clamps, conduits, supports, brackets and staples, all of metal | "about Madison Electric Products" webpage states: "Madison Electric Products provides over 2,500 field-tested and field-created products developed by electricians for electricians," and offers those products under the registered (stylized) mark. *Id*. at 126-230 |
| | ME Elecmetal | | website offers carbon and stainless steel castings for the mining industry; metal alloy crusher wear parts in the mineral processing, aggregate, construction and recycling industries; metal grinding rods for use in rod mills; forged steel balls for SAG mills; and steel plates and cast alloy composite liners under the mark. *Id*. at 231-237. |
| ME (stylized) (Reg. No. 4918778)[15] | Manufacturer Express, Inc. | fastening and anchoring fittings for | Website offers metal hooks, clamps, snap links, towing cable, |

---

[14] The registration includes the following description of the mark: "The mark consists of the stylized letter 'M' merged into a rectangle at one side, with the stylized letter 'E' located within the rectangle and in contrast thereto."

[15] The registration includes the following description of the mark: "The mark consists of a stylized capital 'M' and lower case 'e' with a generally elliptical border all centered on a vertical axis."

| Mark & Reg. No. | Owner | Relevant Goods (Registered) | Relevant Goods (Unregistered) |
|---|---|---|---|
| *Id.* at 30-31. | | securing tie-down straps, hardware for tie-down and winch straps, spring fittings, hooks, transport chains, metal short links to link metal chains, cables, ropes and wires, all of metal | winch cable, and other tools for towing under the registered (stylized) mark. *Id.* at 238-51. |
| ME (stylized) (Reg. No. 3654535)[16] *Id.* at 34-35. | Metal-Era, LLC | building construction materials made of metal" | website offers "a full array of complementary commercial roof accessories" under the registered (stylized) mark, *Id.* at 252-58. |

The mark owned by ME Elecmetal and the mark (and corresponding Reg. No. 4918778) owned by Manufacturer Express, Inc., are used with specialized goods that are facially unrelated to the goods identified in the application or the goods and services for which Opposer demonstrated prior use of its KME mark, and Applicant submitted no evidence to show that they are related (except in the very

---

[16] The registration includes the following description of the mark: "The mark consists of the stylized lettering 'ME'."

general sense that they are metal goods). This evidence therefore has no probative value. *See Omaha Steaks Int'l v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1694 (Fed. Cir. 2018) (error to rely on third-party evidence of similar marks for dissimilar goods where the involved goods are identical, as Board must focus "on goods shown to be similar"); *In re i.am.symbolic, LLC*, 866 F.3d 1315, 123 USPQ2d 1744, 1751 (Fed. Cir. 2017) (disregarding third-party registrations for goods in other classes where the proffering party "has neither introduced evidence, nor provided adequate explanation to support a determination that the existence of I AM marks for goods in other classes, ... support a finding that registrants' marks are weak with respect to the goods identified in their registrations"). The other two marks are registered and/or used with goods that appear to be related to Opposer's goods and services, but there is no evidence that customers of those companies would understand the letters "ME" to refer to "metal" goods, as Applicant posits, rather than as a shorthand reference to the companies' names (Madison Electric and Metal-Era). Such consumer understanding of the marks as shorthand is even more likely for consumers who view the Madison Electric product catalog on the company's website,



or the Metal-Era website,



both of which prominently display the company's mark and name in proximity. *Id.* at 131 and 252, respectively.

The following chart summarizes the four other third-party marks:

| Mark & Reg. No. | Owner | Relevant Goods (Registered) | Relevant Goods (Unregistered) |
|---|---|---|---|
| GME (standard characters) (Reg. No. 4939048) *Id*. at 36-37. | Arcosa Shoring Products, Inc. | panels of metal, namely protective metal walls, boxes, and shields used when excavating | website displays mark in stylized form above the wording "Trench Protection Specialists," and offers "Aluminum Trench Shields," "Hydraulic Shoring Products," "modular Minimum Systems" for excavation "aluminum sheeting" and "steel trench wrapped aluminum trenches" under the registered mark. *Id*. at 70-96. |
| DME (stylized) (Reg. No. 2232773)[17] *Id*. at 38-39. | DME Company LLC | metal mold bases and metal mold plates | website offers "mold makers worldwide" a "Large On-Site Inventory" of "mold and die tool steel, precision machined plates, standard and custom mold bases" under the registered (stylized) DME mark. *Id*. at 97-108. |
| HME HUNTING MADE EASY and design (Reg. No. 5813936)[18] | Good Sportsman Marketing, LLC | hunting equipment and accessories in | Bass Pro Shops website offers metal fishing hooks and folding bow hangers |

[17] The registration includes the following description of the mark: "The mark consists of the letters DME in front of a curved line."

[18] The registration includes the following description of the mark: "The mark consists of a stylized image of a deer head with antlers inside of a pentagon to the left of the letters 'HME.' The words 'HUNTING MADE EASY' is situated beneath the letters 'HME.'"

| Mark & Reg. No. | Owner | Relevant Goods (Registered) | Relevant Goods (Unregistered) |
|---|---|---|---|
| *Id.* at 40-41. | | the nature of field dressing equipment and wild game preparation tools, namely, metal hooks | under the mark HME with no design.[19] *Id.* at 109-113. |
| ACME[20] | Acme Metal Spinning | | website offers "metal spinnings" for various lighting fixtures and accessories, "electrical housings, bezels, bowls, tank heads, agriculture wheel hubs, and much more." *Id.* at 114-25. |

As was the case with two of the four third-party ME marks discussed above, the goods that are registered and offered under the GME and HME marks are facially unrelated to the goods identified in the application or to the goods and services for which Opposer demonstrated prior use of its KME mark, and Applicant submitted no evidence to show that they are related (except in the very general sense that they are

[19] It is unclear whether the metal fishing hooks and bow hangers offered by Bass Pro Shops are manufactured by Good Sportsman Marketing, LLC, the owner of Reg. No. 5813936, or another third party, but such clarity is not required here, because as noted below, the identified hunting and fishing equipment is not related to the goods identified in the application or the goods or services for which Opposer has established prior use. *Omaha Steaks*, 128 USPQ2d at 1694 (error to rely on third-party evidence of similar marks for dissimilar goods, as Board must focus "on goods shown to be similar").

[20] Applicant also submitted Reg. No. 4950178 for the mark ACME, owned by a different company, Acme Cosmetic Components, LLC, for "metal storage containers for cosmetics, namely, packaging pans and godets." 17 TTABVUE 42-43. Opposer discussed this registration in its brief, 22 TTABVUE 31, but Applicant did not. We therefore do not further consider this registration.

metal goods). This evidence therefore has no probative value. *See Omaha Steaks*, 128 USPQ2d at 1694. The other two marks cover goods that are related to Opposer's goods, but the marks do not show weakness of the two-letter combination "ME." Rather, the ACME mark comprises an English word defined as "the highest point; summit; peak."[21] And the stylized DME mark is a clear reference to the company's name, as the webpage for DME STEEL on the DME website shows:



---

[21] Dictionary.com Unabridged, based on THE RANDOM HOUSE DICTIONARY UNABRIDGED (2023), accessed September 27, 2023. The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format or have regular fixed editions. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016). We do so here.



17 TTABVUE 97.

Even if we accept, arguendo, that the letters ME alone are highly suggestive of "metal" and that they are widely used in the metals industry, it does not follow that Opposer's mark KME, which comprises a three-letter combination, also is conceptually or commercially weak. We distinguish *Spireon,* 2023 USPQ2d 737, at *5, which requires the Board to consider under the sixth *DuPont* factor evidence of third-party registrations and use of composite marks when the marks of the plaintiff and defendant are not identical but "share a common segment." That case involved two parties who used the recognizable term "FLEX" either as their entire mark or as part of their composite marks, and the Federal Circuit concluded that the Board had not considered other composite marks that shared the "common segment" "FLEX." That logic does not apply here, where the letters "ME" are not a separate element of the three letter combination marks of Applicant or Opposer, or as used in, or

registered by, any third party with a three letter combination mark of record. Accordingly, Applicant's evidence of third-party uses and registrations does not show that Opposer's mark KME is conceptually or commercially weak.

### 4. Conclusion as to Strength of Opposer's KME Mark

On this record, we find Opposer's KME mark inherently distinctive and arbitrary, and therefore conceptually strong. We further find the mark to be of average commercial strength when used on or in connection with the goods and services for which Opposer has established priority. Applicant's evidence of third-party use and registration does not reduce the normal scope of protection to which an inherently distinctive mark is entitled. *See Bell's Brewery,* 125 USPQ2d at 1347 (finding opposer's marks entitled to "the normal scope of protection to which inherently distinctive marks are entitled").

### E. Market Interface

The tenth *DuPont* factor requires us to consider evidence pertaining to the "market interface" between the parties, including evidence of any past dealings between the parties that might indicate a lack of confusion in the present case. *DuPont*, 177 USPQ at 567. "*DuPont* lists several possible market interfaces, such as: (1) consent to register or use; (2) contractual provisions designed to preclude confusion; (3) assignment; and (4) laches and estoppel attributable to the challenger that would indicate lack of confusion." *Cunningham*, 55 USPQ2d at 1847 (citing *DuPont*, 177 USPQ at 567).

Applicant did not address this factor in its brief, other than acknowledging that as part of the APA, Applicant "was to remove reference to 'KME' and to refrain from adopting a confusingly similar mark." 25 TTABVUE 10. Most decisions involving the tenth *DuPont* factor address agreements that clearly show the parties' business-driven conclusion and belief that there is no likelihood of confusion; such agreements weigh heavily in favor of a finding that confusion is not likely. *See In re Four Seasons Hotels Ltd.*, 987 F.2d 1565, 26 USPQ2d 1071, 1072 (Fed. Cir. 1993) (consent agreements should carry great weight in the likelihood of confusion analysis); *Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.*, 811 F.2d 1479, 1 USPQ2d 1775, 1778 (Fed. Cir. 1987) ("[I]n trademark cases involving agreements reflecting parties' views on the likelihood of confusion in the marketplace, ... such agreements may, depending on the circumstances, carry great weight ...."); *see also*, *e.g.*, *In re Am. Cruise Lines, Inc.*, 128 USPQ2d 1157, 1163 (TTAB 2018) ("[T]he consent to use and register Applicant's mark weighs heavily against a finding that there is a likelihood of confusion."). *Cf. Wet Seal, Inc. v. FD Mgmt., Inc.*, 82 USPQ2d 1629, 1641 (TTAB 2007) ("Applicant has not explained how the agreement 'negates' the likelihood of confusion and we do not find that it does."). Other common types of "market interface" include business affiliations such as licensing agreements and distributorship agreements. *Cunningham*, 55 USPQ2d at 1847 (citing *DuPont*, 177 USPQ at 567).

This case presents an opportunity for the Board to expand the types of "market interfaces" relevant under the tenth *DuPont* factor to include the sale of a portion of an ongoing business to a direct competitor, and to consider the impact of certain

"agreement provisions" in the APA "designed to preclude confusion." *DuPont*, 177 USPQ2d at 567. Rather than indicating the parties' belief that confusion **would not** be likely if Applicant used a mark similar to Opposer's KME mark after Opposer sold its brass division and portions of its tubes manufacturing business to Applicant, the APA reflects the parties' recognition that confusion **would** be likely unless Applicant used a mark that is not confusingly similar to Opposer's KME mark. In particular, the parties agreed that Applicant would "cease making use of the trade names and product or service marks of [Opposer] or **confusingly similar designations or trademarks**." APA § 19.5.2. Becker Test. Decl., 11 TTABVUE 76 (emphasis added). While the language in APA § 19.5.2 does not define what would comprise a "confusingly similar" mark, it adds a layer of contractual obligation over the Trademark Act Section 2(d) prohibition against registration of a mark that is likely to cause confusion with a prior used or registered mark owned by another.

*DuPont* teaches that in the context of consent agreements, "when those most familiar with use in the marketplace and most interested in precluding confusion enter agreements designed to avoid it, the scales of evidence are clearly tilted. It is at least difficult to maintain a subjective view that confusion will occur when those directly concerned say it won't." *DuPont*, 177 USPQ at 568. In other words, if the involved parties, who best know their industry, do not think confusion is likely and they enter into an agreement "designed to avoid it," this factor weighs strongly against a finding of likely confusion. *Id.*

The same rationale applies in the context of the APA, where the parties, who are "most familiar with use in the marketplace and most interested in precluding confusion[,] enter[ed] into an agreement designed to avoid it." *Id*. Opposer and Applicant, who are competitors in the metals industry, included a specific contractual provision in the APA requiring Applicant not to use a confusingly similar mark after ceasing use of Opposer's mark and name.

We apply this reverse presumption to the facts of this case, and find the market interface factor weighs slightly in favor of a finding of likelihood of confusion, to the extent the parties acknowledged a need for Applicant to choose a non-confusingly similar mark per APA § 19.5.2.[22]

F.    Nature and Extent of Actual or Potential Confusion

As evidence of actual confusion under the seventh factor, and the extent of potential confusion under the twelfth factor, *DuPont*, 177 USPQ at 567, Opposer points to four emails from European companies to Opposer: (1) an invoice that was addressed to Applicant; (2) a request for a price estimate for a system with components manufactured by Applicant; (3) a request for a price estimate for a damage assessment that Opposer did not order, addressed to Opposer at the address for Applicant (without naming or otherwise mentioning Applicant); and (4) a request for a price estimate for products that Opposer previously produced but sold to Applicant under the APA, addressed to Opposer at Opposer's mailing address

---

[22] Opposer does not argue, and we do not find, that Applicant breached the APA. We address below Opposer's argument that Applicant adopted the stylized HME mark in bad faith, and find no bad faith adoption.

(without mentioning Applicant). Rima Test. Decl. 12 TTABVUE 25-30, ¶¶ 123-163 (referencing Exhibits 59, 61-63, 13 TTABVUE 254-259, 263-300, respectively).

In our proceedings, "[a]ctual confusion is entitled to great weight but only if properly proven." *Georgia-Pacific Corp. v. Great Plains Bag Co.*, 614 F.2d 757, 204 USPQ 697, 701 (CCPA 1980). Properly introducing instances of actual confusion into the record and persuading the trier of fact as to the probative value of such evidence is Opposer's burden. *See Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1479 (TTAB 2014).

To the extent the four emails show any customer confusion, the confusion is limited to consumers (and a vendor who does not also appear to be a customer) in Europe and does not bear on the question of whether there has been any actual confusion by consumers in the United States as to the source of the goods identified in the application and the goods and services for which Opposer has demonstrated prior use of its KME mark. Indeed, there is no record evidence of any actual confusion by consumers in the United States.

Pointing to the same emails, Opposer argues that the eighth *DuPont* factor "is not relevant here because there have in fact been multiple instances of actual confusion that have occurred in a relatively short period of time." 22 TTABVUE 34. The eighth *DuPont* factor is "[t]he length of time during and conditions under which there has been concurrent use without evidence of actual confusion." *DuPont*, 177 USPQ at 567. But, argues Opposer, to the extent the eighth *DuPont* factor is relevant, it weighs "strongly" in favor of a finding of likelihood of confusion because "four known

instances of actual confusion" have occurred since 2019, "and it is highly likely that there are even more occurrences of confusion in the market of which [Opposer] is not yet aware." 22 TTABVUE 35. Opposer's arguments under this factor are both misguided, because the factor addresses the possible impact of the absence of evidence of actual confusion, not its existence, and contrary to our finding that there is no evidence of actual confusion in the United States.

However, an absence of evidence of actual confusion is meaningful only if the record indicates appreciable and continuous use by Applicant of its mark for a significant period of time in the same markets as those served by Opposer under its mark. *Citigroup, Inc. v. Capital City Bank Grp., Inc.*, 94 USPQ2d 1645, 1660 (TTAB 2010); *Gillette Can. Inc. v. Ranir Corp.*, 23 USPQ2d 1768, 1774 (TTAB 1992). In other words, for the absence of actual confusion to be probative, there must have been a reasonable opportunity for confusion to have occurred. *Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283, 1287 (TTAB 2007) (the probative value of the absence of actual confusion depends upon there being a significant opportunity for actual confusion to have occurred); *Central Soya Co., Inc. v. N. Am. Plant Breeders*, 212 USPQ 37, 48 (TTAB 1981) ("[T]he absence of actual confusion over a reasonable period of time might well suggest that the likelihood of confusion is only a remote possibility with little probability of occurring."). Here, the parties have only used their respective marks contemporaneously in the United States with their respective goods and services for, at most, three years (most of which occurred during the worldwide COVID pandemic). The record therefore does not support a finding that there has

been a reasonable period of time and opportunity for confusion to have occurred. *See, e.g., Top Tobacco*, 101 USPQ2d at 1174-75 (absence of actual confusion may be probative where there has been a reasonable period of time and opportunity for confusion to have occurred); *accord Wella Corp. v. Cal. Concept Corp.*, 558 F.2d 1019, 194 USPQ 419, 422-23 (CCPA 1977); *cf. G.H. Mumm & Cie v. Desnoes & Geddes, Ltd.*, 917 F.2d 1292, 16 USPQ2d 1635, 1638 (Fed. Cir. 1990) (lack of actual confusion in over a decade was significant factor showing that confusion was unlikely).

The seventh, eighth and twelfth *DuPont* factors are neutral.

### G. Variety of Goods

The ninth *DuPont* factor requires us to consider "[t]he variety of goods on which a mark is or is not used (house mark, 'family' mark, product mark). *DuPont*, 177 USPQ at 567. Although Opposer acknowledges that the KME mark is not a house mark or a family mark, Opposer argues that KME "is treated as a shorthand for the company name and applies to all of its various products, and so, it deserves broad protection." 22 TTABVUE 36. In view of our finding that Applicant's identified goods include goods that are identical or otherwise closely related to the goods and services for which Opposer has established prior use of its KME mark, there is no need to rely on this factor which, in essence, is used to show relatedness of the goods and services. *See Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, at *60 ("Given the relatedness of the parties' identified goods, we find it unnecessary to rely on this factor."). Accordingly, this factor is neutral.

H. Extent to Which Applicant has a Right to Exclude Others From use of its Marks on its Goods

The eleventh *DuPont* factor considers any evidence that an applicant has a right to exclude third parties from using its mark. *DuPont*, 177 USPQ2d at 567. Under this factor, the Board assesses whether the applicant has achieved "an appreciable level of consumer recognition" **and** whether the applicant could demonstrate having "successfully asserted its [trademark] rights." *Monster Energy*, 2023 USPQ2d 87, at *45 (quoting *McDonald's Corp. v. McSweet, LLC*, 112 USPQ2d 1268, 1285 (TTAB 2014)). Opposer argues Applicant has no right to exclude, 22 TTABVUE 39, and Applicant does not address this factor in its brief. Because Applicant has not provided any significant information about the advertising and sales of its goods sold under the stylized HME mark, and because there is no evidence that Applicant has successfully asserted its rights so as to "exclude" third parties from using its mark, this *DuPont* factor is not relevant, or is neutral. *See, e.g., DeVivo v. Ortiz*, 2020 USPQ2d 10153, at *15 (TTAB 2020) (citing *McDonald's v. McSweet*, 112 USPQ2d at 1284-85 ("Applicant's sales figures and Applicant's advertising and promotional expenditures are not sufficient to establish an appreciable level of consumer recognition.") (internal citation omitted).

I. Applicant's Alleged Bad Faith Adoption

Under the thirteenth *DuPont* factor, Opposer argues that Applicant willfully disregarded its contractual obligations under the APA by adopting in bad faith a confusingly similar mark in an attempt trade on Opposer's goodwill. 22 TTABVUE 40-41. "A party's bad faith in adopting a mark is relevant to the thirteenth *DuPont*

factor, which includes 'any other established fact probative of the effect of use.'" *Quiktrip W., Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 2021 USPQ2d 35, at \*4 (Fed. Cir. 2021) (citing *DuPont*, 177 USPQ at 567).

Applicant does not directly address this argument in its brief, but merely explains that Applicant complied with the APA by "remov[ing] all reference to 'KME' in connection with Opposer's brass division and adopt[ing] the name 'HME' utilizing a different logo and color scheme." 25 TTABVUE 10 (referencing Opp. Br., 22 TTABVUE 16). As discussed above, Applicant also explained the derivation of its stylized HME mark, including "maintaining its longstanding blue color, including a Capital H partly comprised of a red square." *Id.* at 10 (referencing Xueyan Test. Decl., 18 TTABVUE 2, ¶ 2). And Applicant posted on its "ABOUT THE COMPANY" webpage information about the acquisition of Opposer's brass division and the name change from "KME" to "HME." *Id.* at 10 (referencing App. NOR, 17 TTABVUE 12).

An inference of "bad faith" requires an intent to confuse, which is more than mere knowledge of a prior similar mark. *Quiktrip W.*, 2021 USPQ2d 35, at \*4. Although we resolved the tenth *DuPont* factor concerning the market interface slightly in favor of a finding of likely confusion based on Section 19.5.2 of the APA, which prohibits Applicant from using a confusingly similar mark, and we found Applicant's stylized HME mark similar to Opposer's KME mark under the first *DuPont* factor, there is insufficient evidence to support a finding that Applicant adopted the mark in bad faith, i.e., with an intent to confuse. However, a showing of bad faith is not required to establish likelihood of confusion under Section 2(d) of the Trademark Act. *J&J*

*Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed Cir. 1991) ("Whether there is evidence of intent to trade on the goodwill of another is a factor to be considered, but the absence of such evidence does not avoid a ruling of likelihood of confusion."); *Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*, 853 F.2d 888, 7 USPQ2d 1628, 1630 (Fed. Cir. 1988) ("Moreover, proof of intent to trade on another's goodwill, while persuasive evidence of likelihood of confusion, is not, in any event, a requirement under section 2(d).").

The thirteenth *DuPont* factor is neutral.

### J.    Conclusion

Weighing the *DuPont* factors for which there has been evidence and argument in this appeal, *Charger Ventures*, 2023 USPQ2d 451, at *7 ("[I]t is important … that the Board … weigh the *DuPont* factors used in its analysis **and** explain the results of that weighing.") (emphasis in original), we summarize our findings as follows:

- the similarities of the goods and services, and their trade channels and classes of consumers, weigh heavily in favor of a finding of likelihood of confusion;

- the similarities of the marks weigh in favor of a finding of likelihood of confusion;

- Opposer's history of renaming and restructuring itself, combined with Opposer's prior ownership of Applicant's brass division, industry norms concerning legal entity changes, and the similarities between the marks and the goods sold thereunder, outweigh any sophisticated purchasing

decision. *See HRL Assocs. Inc. v. Weiss Assocs. Inc.*, 12 USPQ2d 1819, 1823 (TTAB 1989), *aff'd*, 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990) (similarities of goods and marks outweigh sophisticated purchasers, careful purchasing decision, and expensive goods);

• when used on or in connection with the goods and services for which Opposer has established priority, Opposer's KME mark is inherently distinctive and conceptually strong, of average commercial strength, and Applicant's evidence of third-party use and registration does not reduce the normal scope of protection to which an inherently distinctive mark is entitled;

• the parties' market interface weighs slightly in favor of a finding of likelihood of confusion to the extent the parties acknowledged a need for Applicant to choose a non-confusingly similar mark per APA § 19.5.2; and

• the other *DuPont* factors for which there is evidence and argument are neutral.[23]

Having weighed and balanced the *DuPont* factors for which there is evidence and argument, we conclude that Opposer has proved its claim of likelihood of confusion in each International Class by a preponderance of the evidence.[24]

---

[23] Because Opposer presented argument but there is no record evidence concerning the *DuPont* factor of Applicant's right to exclude, that factor is not relevant, or is neutral.

[24] As noted at the beginning of this decision, we therefore need not and do not reach Opposer's Section 2(a) claim.

**Decision**: The opposition is sustained under Section 2(d) of the Trademark Act in each class.